**Paul SALADIN, Plaintiff,**

v.

**Terry TURNER, individually and d/b/a The French Hen Restaurant, and d/b/a Capistrano Restaurant, Defendant.**

**No. 94–C–702–K.**

United States District Court, N.D. Oklahoma.

May 23, 1996.

Donald Greg Bledsoe, Steven A. Novick, Tulsa, OK, Katrina S. Bodenhamer, Bodenhamer & Levinson, Tulsa, OK, for plaintiff.

Thomas D. Robertson, Paula J. Lynch, Nichols Wolfe Stamper Nally & Fallis Inc., Tulsa, OK, for defendant.

*FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER*

KERN, District Judge.

This matter was tried to the Court without a jury on March 7, 8 and 11, 1996. Upon consideration of the pleadings, the briefs of the parties, and the evidence presented at the trial both by testimony and exhibit, the Court hereby enters its Findings of Fact and Conclusions of Law in accordance with Rule 52(a) F.R.Cv.P..

### Findings of Fact

1. Plaintiff Paul Saladin was employed by the defendant Terry Turner as a waiter in the French Hen Restaurant from June, 1985 to sometime in October, 1993.

2. Defendant Terry Turner owns and operates an upscale restaurant in Tulsa, Oklahoma known as the French Hen. Turner operates the restaurant as a sole proprietor, but leaves the day-to-day operations to a manager.

3. Defendant was an employer of plaintiff within the meaning of the Americans with Disabilities Act (ADA) during 1993.

4. Defendant employed at least twenty-five employees, but less than one hundred employees, during all of 1992 and 1993.

5. Plaintiff was recognized as an excellent waiter by the French Hen management, his co-workers at the French Hen, and customers of the French Hen.

6. Plaintiff had a substantial number of "call customers", i.e., customers who would specifically request to be served by plaintiff.

7. Plaintiff is a homosexual male, and he had a long-term relationship with Ed Gaudin, with whom plaintiff lived. Gaudin had worked for defendant at defendant's other restaurant, but Gaudin was not employed by defendant at the times relevant to this case.

8. In the fall of 1987, Gaudin tested positive for human immunodeficiency virus (HIV) and plaintiff learned of his partner's infection.

9. Plaintiff was concerned he might also be infected with HIV and he shared this concern with a co-worker at the French Hen Restaurant.

10. In November 1987, the restaurant owner, defendant Terry Turner, became aware that plaintiff might be infected with HIV, and directed that plaintiff be suspended from his employment at the French Hen until he was tested by a physician for HIV. Saladin was tested, was found negative for HIV, and was allowed by Turner to return to work.[1]

11. The length of plaintiff's 1987 suspension was approximately two weeks.

12. Plaintiff retrieved his liquor license from the French Hen and worked elsewhere while waiting for the test result.

13. In 1987, Defendant was concerned about the possibility of the transmission of HIV/AIDS to customers by casual contact.[2]

14. In October, 1992, plaintiff's partner, Ed Gaudin, developed symptoms consistent with AIDS, and was medically diagnosed with AIDS in February, 1993. Gaudin stopped working in December, 1992 as a result of health problems associated with his HIV status. He died of complications from AIDS in July, 1995.

15. Customers of the French Hen who knew plaintiff and/or Gaudin would occasionally ask plaintiff about Gaudin's health status, plaintiff's AIDS hospice volunteer work, and plaintiff's HIV/AIDS education activities. Plaintiff would respond to these customer inquiries, on occasion using the terms "HIV" or "AIDS".

16. Plaintiff was never requested or instructed to refrain from discussing HIV, AIDS and/or the health status of Ed Gaudin

---

1. Plaintiff filed no EEOC charge regarding this 1987 incident. The Court admitted evidence of the incident not as substantive proof, but as relevant background evidence. *See Noland v. McAdoo,* 39 F.3d 269, 271–72 (10th Cir.1994). The inference of "pattern" which plaintiff wishes the Court to draw is weak. Scientific knowledge regarding the communicability of HIV/AIDS has increased greatly since 1987.

2. Defendant has not asserted in this action a defense based upon infectious or communicable diseases and food handling. *See* 42 U.S.C. § 12113(d)(2).

with customers of the French Hen prior to September 17, 1993.

17. Immediately prior to plaintiff's regular shift on September 17, 1993, Jennifer Wallace, defendant's manager at the French Hen, met with plaintiff in the office of the French Hen and directed plaintiff to cease discussing his partner's AIDS condition while waiting on tables. This meeting lasted approximately ten minutes. Jennifer Wallace was defendant's manager of the French Hen during 1993, and she had authority to make decisions regarding plaintiff's employment on behalf of the defendant. The French Hen had no written rules of conduct for employees.

18. During this pre-shift meeting on September 17, 1993, Ms. Wallace informed plaintiff she had received a customer complaint from Reece Morrel concerning plaintiff's discussions of Ed Gaudin's health status in the restaurant. Although plaintiff stated he believed the policy unfairly cut him off from his customers, plaintiff indicated he would comply with Ms. Wallace's request. Ms. Wallace believed the matter had been resolved.

19. Plaintiff performed his duties as a waiter on the evening of September 17, 1993, without discussing the health status of Ed Gaudin in the French Hen.

20. After the conclusion of the shift on September 17, 1993, several employees gathered at the bar for coffee and drinks. These employees included Sondra Mauldin, Sonya Barrett, plaintiff, and Jennifer Wallace. Such post-shift get-togethers were common at the French Hen, and were regarded by staff as a time for relaxation and discussion.

21. At the post-shift get-together on September 17, 1993, Ms. Wallace initiated a discussion of the request she had made of plaintiff before the shift by asking him if he had any questions regarding her request. At first, plaintiff indicated he had no questions, but upon the encouragement of the other staff, plaintiff asked questions about how he should handle customer inquiries about Gaudin's condition, his AIDS hospice work, and

his AIDS education activities. A general discussion of the issue ensued. During this discussion, plaintiff was somewhat quiet and thoughtful, but acted normally. He did not act in a way that challenged or defied Ms. Wallace's authority, nor did he demonstrate disrespect toward Ms. Wallace. Ms. Wallace's testimony that plaintiff was "ranting and raving" and suggested he would not comply is not credible.[3]

22. At the conclusion of the September 17, 1993 post-shift gathering, plaintiff and Sondra Mauldin walked outside of the restaurant together. Outside the restaurant, plaintiff started crying, and stated to Ms. Mauldin that he would do as Ms. Wallace asked, because he would do anything to keep his job.

23. Plaintiff worked full evening shifts at the French Hen on September 18 and 21, 1993. During these work shifts, plaintiff fully complied with Ms. Wallace's request to refrain from discussing Gaudin's condition and other AIDS-related topics in front of the customers.

24. Sometime during the period between September 17, 1993 and September 22, 1993, plaintiff confided in his good friend Ruth Mitchell that he would do anything to keep his job. On September 20, 1993, plaintiff purchased a new pick-up truck.

25. On or about September 22, 1993, Ms. Wallace met with the defendant and informed him about her meeting with the plaintiff on September 17, 1993 and the reasons for that meeting. During the meeting between Ms. Wallace and the defendant, she informed him that Ed Gaudin had AIDS. Prior to this conversation, defendant had no knowledge Ed Gaudin was HIV positive or had AIDS.

26. Defendant knew plaintiff was homosexual and that he had an intimate, long-term relationship with another homosexual male, Gaudin.

27. During his September 22, 1993 meeting with Ms. Wallace, defendant instructed Wallace to suspend the plaintiff without pay

---

**3.** At trial, Sonja Barrett testified she thought plaintiff was challenging Wallace's authority in the post-shift meeting. She did not so testify in her deposition, and the Court discounts the credibility of the trial testimony.

for thirty days. Ms. Wallace agreed with this directive. This was the longest suspension imposed by defendant upon any French Hen employee during the entire period of plaintiff's employment at the restaurant. Another employee received only a two-week suspension for adding a tip to a customer's credit card bill without authorization.

28. Plaintiff's association and relationship with Ed Gaudin was a motivating factor in defendant's decision to suspend plaintiff for thirty days without pay.

29. On September 22, 1993, plaintiff was scheduled to work a regular evening shift at the French Hen. On September 22, 1993, Ms. Wallace telephoned plaintiff and requested he come to work early, but did not state why. Plaintiff asked if he should dress for work, and Ms. Wallace said no. Based upon Ms. Wallace's secretive behavior and the events of the past several days, plaintiff believed he was about to be terminated from his job. At the suggestion of Mr. Gaudin, plaintiff brought a tape recorder with him to the restaurant.

30. Plaintiff met with Ms. Wallace at the French Hen on September 22, 1993. With Ms. Wallace's assent, plaintiff tape recorded the entire conversation between himself and Ms. Wallace. During this meeting, Ms. Wallace informed the plaintiff that defendant had directed her to suspend plaintiff for thirty days without pay. The stated reasons for the suspension were alleged customer complaints about plaintiff's discussions of Gaudin's health status in the restaurant and speculative concern that customers would be disturbed by the fact plaintiff was living with a person with AIDS. There was no mention of any insubordination on the part of plaintiff.

31. Although Ms. Wallace testified there were numerous complaints both from customers and French Hen staff, she could identify only one complaining customer. At trial, this customer denied making a complaint, although he did testify he asked to be seated elsewhere in the restaurant than the area served by plaintiff. Moreover, four former and current members of the French Hen staff denied making any complaints. The one other French Hen staff member identi-fied as having made a complaint is still employed at the French Hen, but was not called as a witness by the defendant. There is no credible evidence that any customers or staff complained regarding plaintiff's behavior in the restaurant.

32. Immediately after the suspension, plaintiff made numerous efforts to contact the defendant, because plaintiff believed there had been some miscommunication. Defendant did not return plaintiff's telephone calls.

33. During plaintiff's suspension from the French Hen, plaintiff's friend Gary Mitchell, a restaurant owner, indicated to plaintiff that he might have some temporary work for plaintiff in catering parties. Mitchell indicated plaintiff would need his liquor license to perform this temporary work.

34. On October 6, 1993, plaintiff went to the French Hen to retrieve his liquor license. He did not retrieve pens which he had specially purchased for use in the restaurant. While in the restaurant, plaintiff visited with Sondra Mauldin and Susie Thomas about his trip with Gaudin to visit Gaudin's parents, a movie he and Gaudin had just seen, and other small talk. Plaintiff never said anything to these co-workers about quitting his job at the French Hen, nor did plaintiff engage in any behavior that would suggest he was quitting his employment. When asked by employee Tracy Berna what he would do if he did not have his job anymore, plaintiff replied he might have to speak with a lawyer.

35. Ms. Wallace received a report of the events of October 6, 1993 from a seventeen year old back waiter (busboy) named Ryan Wheeler. Wheeler reported plaintiff said he would not be there anymore. Wallace made no effort to verify the report she received from Wheeler with plaintiff. Wallace told defendant of the report she received from Wheeler, including the comment about plaintiff talking with a lawyer.

Gary Mitchell testified that in his long experience as a restaurant manager and owner, he would not have relied upon the report of a teenage bus boy that an employee of long standing had resigned. Mitchell

opined that sound restaurant management practice would have been to verify the report directly with the employee in question.

36. From October 10, 1993 through October 14, 1993, plaintiff was in Detroit, Michigan visiting his mother. The arrangements and payment for this trip had been made before September 17, 1993.

37. On October 12 and 13, 1993, the French Hen ran a classified advertisement in the Tulsa World for a waiter. The advertisement indicated interviews would be conducted on October 13 and 14, 1993. Plaintiff did not learn of this advertisement until late on the night of October 14, 1993.

38. On October 15, 1993, plaintiff telephoned Jennifer Wallace at the French Hen. Plaintiff told Wallace he would be ready to return to work at the end of his suspension on October 22, 1993, and inquired about the newspaper advertisement. Wallace informed the plaintiff he no longer had a job at the French Hen and he was being replaced.

39. Testifying as a rebuttal witness, Sondra Mauldin testified that approximately one week after plaintiff's October 15, 1993 telephone conversation with Wallace, Wallace commented to Mauldin in reference to the plaintiff, "I had to let him go."

40. In late October, 1993, Wallace called Reece Morrel on the telephone, requesting Morrel provide a written statement explaining why he requested not to be seated in plaintiff's section in the restaurant. Morrel declined to provide the statement. During this telephone conversation, Wallace told Morrel the French Hen had "terminated" plaintiff.

41. Plaintiff was discharged from his employment sometime between October 6, 1993 and October 15, 1993.

42. Shortly after the October 15, 1993 telephone conversation between Wallace and plaintiff, Wallace informed defendant of the substance of the conversation, including plaintiff's statement of readiness to return to work.

43. Plaintiff made several efforts to contact defendant by telephone concerning his employment at the French Hen. Defendant failed to return any of plaintiff's calls. Plaintiff reached defendant on the telephone on or about October 18, 1993, but defendant stated he was busy and hung up the telephone.

44. On October 18, 1993, plaintiff submitted an application for unemployment benefits. The French Hen hired Guy Seaman to replace plaintiff. Seaman worked on October 15, 16 and 18, 1993, and then failed to return to work. The French Hen replaced Seaman with Allison Gallagher on or about November 1, 1993.

45. Defendant knew plaintiff wanted to return to his employment at the French Hen at the time Seaman left his employment with the French Hen. The defendant also knew the French Hen had an opening for a waiter on or about October 19, 1993, before the expiration of plaintiff's suspension. Defendant made no effort to reinstate plaintiff at this time.

46. On or about October 25, 1993, Wallace submitted a written statement to the Oklahoma Employment Security Commission (OESC) in connection with plaintiff's application for unemployment benefits. This written statement is the first mention of defendant's claim that plaintiff was insubordinate to the restaurant manager Wallace.

47. Wallace told plaintiff that defendant had instructed her to prepare the written statement to the OESC, and further instructed her to claim plaintiff was insubordinate and had quit his employment.

48. Plaintiff submitted a charge of discrimination to the Equal Employment Opportunity Commission on October 28, 1993. Sometime between November 23, 1993 and December 13, 1993, defendant was notified plaintiff had filed a charge of discrimination.

49. In late November, 1993, plaintiff obtained employment as a waiter at Mondo's Restaurant in Tulsa, Oklahoma.

50. On December 6, 1993, defendant received a demand letter from plaintiff's attorney threatening suit, claiming discrimination, and claiming plaintiff had been wrongfully terminated from his employment. On December 14, 1993, defendant visited with his attorney in connection with this case for the first time.

51. Plaintiff's application for unemployment benefits was initially denied, and plaintiff appealed to the OESC Appeal Tribunal. The OESC Appeal Tribunal found plaintiff was discharged from his employment at the French Hen, that plaintiff was suspended from his employment at the French Hen because of alleged customer complaints about his discussions of Gaudin's condition in the restaurant, and that plaintiff's discharge was not for misconduct. The decision was mailed to plaintiff and defendant December 17, 1993.

52. On December 17, 1993, the day after the unemployment appeal hearing, defendant called plaintiff's home in the evening. Ed Gaudin answered the telephone and a conversation ensued. Turner asked Gaudin if Gaudin were indeed ill, and Gaudin replied he was. Turner knew a doctor in Arkansas who was treating AIDS patients with good results, and offered to give Gaudin the name of the doctor. Turner has a close family member who is HIV positive, and he had some knowledge about the condition and the treatment.

During this conversation, Gaudin said he had been instructed by his doctor to avoid stress, and that he wanted to be left out of the conflict between plaintiff and defendant. Defendant, however, asked Gaudin why plaintiff was suing defendant, and asserted plaintiff was fabricating some of the facts asserted in the proceeding.

53. Shortly before Christmas, 1993, plaintiff was employed as a waiter at Karmichael's Restaurant in Tulsa, Oklahoma. Karmichael's is a restaurant that provides a dining experience similar to the French Hen.

54. In early January, 1994, plaintiff's counsel received a written offer of employment reinstatement from defendant's attorney. This offer was communicated to plaintiff by his attorney. On January 21, 1994, plaintiff communicated through his attorney his rejection of the reinstatement offer. On January 24, 1994, defendant's counsel reiterated the reinstatement offer to plaintiff's counsel and gave a deadline of January 28, 1994 for its acceptance. Plaintiff allowed the deadline to expire, making no counter-offer.

55. Plaintiff rejected defendant's offer of reinstatement based upon what he feared would be defendant's continued hostility and defendant's looking for an opportunity to discharge plaintiff again. Plaintiff testified he feared he would be fired again if he were "thirty seconds late." Plaintiff also noted he already had what he believed to be a secure job at Karmichael's. Earlier in his direct testimony, plaintiff testified Turner had always been fair with him, except for the 1987 HIV testing incident and the 1993 suspension. Plaintiff also testified he had experienced no hostility from Jennifer Wallace during his term of employment.

To the extent any of these Findings of Fact constitute Conclusions of Law, they should be so considered.

### Conclusions of Law

1. This suit arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* The ADA provides "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). "Qualified individual with a disability" is defined at 42 U.S.C. § 12111(8). "Disability" is defined at 42 U.S.C. § 12102(2). For purposes of this action, defendant does not dispute HIV/AIDS is a disability under the ADA.[4] Homosexuality is not a disability under the ADA. 42 U.S.C. § 12211(a).

2. The Court has jurisdiction over the persons and subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331. Plaintiff has exhausted administrative remedies.

3. The plaintiff was an employee of the defendant within the meaning of 42 U.S.C. § 12111(4). The defendant is an employer subject to the provisions of the ADA. 42 U.S.C. § 12111(5).

4. Venue is proper in this judicial district. 42 U.S.C. § 2000e–5(f)(3); 28 U.S.C. § 1391.

5. Plaintiff asserts three distinct claims. Plaintiff asserts a claim under 42

---

**4.** The Court has concluded that Ed Gaudin, certainly after the development of AIDS, was disabled under the definition of 42 U.S.C. § 12102(2)(A).

U.S.C. § 12102(2)(C), which provides an alternative definition of disability as being *regarded* as having a physical or mental impairment that substantially limits one or more of the major life activities of an individual. "A person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment." *Wooten v. Farmland Foods, Inc.*, 58 F.3d 382, 385 (8th Cir.1995). "The focus is on the impairment's effect upon the attitude of others." *Id.*

As framed in the Pretrial Order, the issue presented is "[w]hether plaintiff was discriminated against by defendant because he was regarded as having a disability within the meaning of the ADA because of his association and relationship with Ed Gaudin." (Pretrial Order, Section V.G.).

In other words, plaintiff views this claim as virtually indistinguishable from the "association" claim. The Court disagrees. Insufficient evidence was presented that plaintiff himself was regarded as having HIV or AIDS to sustain a "regarded as" claim.

■ Plaintiff also asserts a claim under 42 U.S.C. § 12203(a) for retaliation. The complaint cites a single instance, the December 17, 1993 phone call from Turner to Gaudin. The EEOC charge filed by plaintiff does not mention retaliation. Defendant seeks to exclude any claim of retaliation. The Court will consider this one instance, over defendant's legal objection. *Brown v. Hartshorne Public School Dist. #1*, 864 F.2d 680 (10th Cir.1988) holds that retaliatory acts occurring after the filing of an EEOC charge are reasonably related to the original charge, obviating the need for a new or amended charge. This Court's order of August 9, 1995, denying plaintiff leave to amend complaint, was based upon plaintiff's representations that he sought to add a state law claim for wrongful discharge in violation of public policy. Plaintiff's claim of retaliation has been present in this case from the filing of the original complaint.

■ However, during the trial plaintiff sought to present other instances of alleged retaliation (e.g., defendant's failure to verify the report of plaintiff's supposed resignation, and defendant's refusal to put plaintiff back to work when defendant knew plaintiff wanted to return to work and there was an opening for a waiter) and to argue that defendant was also motivated by plaintiff's "good faith opposition to practices plaintiff thought were unlawful under the ADA" and his suggestion to others he might get a lawyer. The Court now rejects consideration of this line of argument, for failure to exhaust administrative remedies. Plaintiff's questioning of Wallace's directive and his comment about obtaining counsel were made *before* he filed his EEOC charge and do not fall within the rule of *Brown v. Hartshorne Public School District*. Alleged retaliation of this type should have been raised in the EEOC charge. In view of this ruling, the Court need not consider whether (1) mere opposition to an employer's "speech code" as unfair and (2) the mere suggestion to a co-employee that one might seek an attorney constitute "protected conduct" for purposes of a retaliation claim.

■ In order to succeed on a claim of discriminatory retaliation, a plaintiff must show (1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action." *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701 (3rd Cir.1995). Plaintiff has failed to establish this claim as well. The phone call to Gaudin by Turner did not constitute adverse *employment* action. In no way did it alter the terms and conditions under which plaintiff worked. In any event, the Court does not view the phone call to a third party as retaliatory in nature. It was at worst a clumsy, inappropriate attempt at fact-finding on Turner's part, but was not designed to injure plaintiff in any way.

■ The Court next considers plaintiff's third asserted claim, alleging a violation of 42 U.S.C. § 12112(b)(4), which proscribes discrimination against a qualified individual because of that person's association or relationship with a person with a disability. Plaintiff has made out a prima facie case of discrimination because of association. A prima facie case of discrimination under the ADA in this

case consists of proof by a preponderance of the evidence that (1) plaintiff was in the protected class; (2) plaintiff was able to perform the essential functions of the job; (3) employer terminated him because of his association with a disabled person. *Cf. White v. York Intern. Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995). The evidence supports the conclusion plaintiff was discharged by defendant. Defendant cannot rely upon any "good faith" belief that plaintiff had quit, because defendant and his agent Wallace failed to make even a cursory investigation of the facts.

■ 6. The burden shifts to defendant to articulate his legitimate, nondiscriminatory reasons for acting. The plaintiff must then show the defendant's articulated reasons to be pretextual, and prove that intentional discrimination was the employer's true motivation. *Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir.1995).

■ 7. For purposes of a thorough analysis, the Court concludes defendant has articulated a legitimate nondiscriminatory reason for his action. That is to say, considered in the abstract, the Court holds a restaurant owner can place certain restrictions on employees' speech. A restaurant owner could legitimately conclude that a waiter's discussion of his partner's medical condition (whatever its nature), even upon inquiry from a customer, might be offensive to other customers who come to enjoy a "fine dining" experience. Accordingly, a properly crafted "speech code" could be enforced, if proper notice were given to employees.[5] The Court stresses this conclusion is "in the abstract", because the facts of this case demonstrate the reason to be pretextual.

■ 8. Plaintiff has met his ultimate burden of proving discrimination on the part of defendant. Plaintiff's relationship and association with a person with a disability was a motivating factor in the defendant's decision to suspend and discharge the plaintiff from his employment at the French Hen, and de-

fendant thereby engaged in unlawful discrimination under the ADA.

■ 9. Wallace testified that customers being concerned about plaintiff's association with Gaudin was a factor in the suspension. Under the ADA, effect may not be given to the public's fears or stereotypes. *Cf. Doe v. District of Columbia,* 796 F.Supp. 559, 570 (D.D.C.1992); *Den Hartog v. Wasatch Academy,* 909 F.Supp. 1393, 1400 (D.Utah 1995) ("[T]he ADA association provision is targeted at prohibiting unfounded stereotypes and assumptions against employees who associate with disabled people.")

10. Defendant's claims that plaintiff was insubordinate and that plaintiff resigned his employment with the French Hen are pretexts to conceal defendant's true motive of discrimination that resulted in the suspension and discharge of plaintiff. Wallace made no mention of insubordination at the September 22 meeting between herself and plaintiff. Defendant or Wallace did not mention insubordination until their OESC filing.

11. Plaintiff was given an 30–day suspension without pay without being provided a concrete reason, and with no prior warnings or lesser discipline. Wallace is not credible when she testified plaintiff suggested he would not comply with her directive. Plaintiff's sanction was harsher than that given to other employees' infractions, including an employee who falsified a credit card bill. Plaintiff was given rules for conduct but no time to abide by them. No credible evidence was presented of any complaints or occurrences in violation of Wallace's directive.

■ 12. The Court concludes that back pay must be cut off as of January 28, 1994. That date was the expiration of Turner's offer of reinstatement. An ADA claimant must exercise reasonable efforts to mitigate his or her damages. Defendant argues that it made an offer of reinstatement to plaintiff which he refused. *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) holds an employer can

---

5. Plaintiff's counsel conceded in closing argument a waiter could be prohibited from openly discussing the "gory details" of a disease. It seems to the Court a restaurant owner is entitled

to err on the side of protecting his customers' sensibilities, so long as this protection is within the law.

toll the further accrual of back pay liability by making an unconditional offer of reinstatement to the claimant. Plaintiff contends the offer was not bona fide and made in good faith, so he was justified in rejecting it.

*Ford Motor* did not discuss good or bad faith. *Stanfield v. Answering Service, Inc.,* 867 F.2d 1290 (11th Cir.1989) did suggest, as a prerequisite to the tolling rule, an offer of reinstatement must be made in good faith. *See also Lewis v. Federal Prison Industries,* 953 F.2d 1277 (11th Cir.1992). "Special circumstances" (e.g., having to move a great distance to find a replacement job) may make it justifiable for claimant to refuse a bona fide offer. *Ford Motor,* 458 U.S. at 238 & n. 27, 102 S.Ct. at 3069 & n. 27.

However, the Court in *Ford Motor* also grounded its rule upon the statutory duty of claimants to mitigate their damages. 458 U.S. at 231, 102 S.Ct. at 3065. Courts have held the proper test of whether a plaintiff is justified in rejecting an offer of reinstatement is an objective one, examining whether a reasonable person in the claimant's position would decline the offer. *Morris v. Amer. Nat. Can Corp.,* 952 F.2d 200, 203 (8th Cir. 1991). Thus, it would seem the question of whether the offer was bona fide merges with the issue of whether it was reasonably rejected. *See Miano v. AC & R Advertising, Inc.,* 875 F.Supp. 204, 223–24 (S.D.N.Y.1995).

In *Giandonato v. Sybron Corp.,* 804 F.2d 120 (10th Cir.1986), the Tenth Circuit took a strict interpretation, stating "an employee is *obligated* to minimize his damages by accepting his employer's offer of reinstatement to his previous job...." *Id.* at 124 (emphasis added). The court said the plaintiff did not comply with *Ford Motor* by refusing an offer for "personal reasons" such as not wanting to work under the same manager. *Id.*

▓▓▓▓▓ The employer bears the burden to prove it made an unconditional offer of reinstatement and that the plaintiff's rejection of it was objectively unreasonable. *Smith v. World Ins. Co.,* 38 F.3d 1456, 1465 (8th Cir.1994). Defendant has met his burden. Plaintiff's mere recitation of hostility (some of it fanciful, as his fear he would be fired if he were thirty seconds late) is insufficient, because "[a]ntagonism between parties occurs as the natural bi-product [sic] of any litigation." *Taylor v. Teletype Corp.,* 648 F.2d 1129, 1139 (8th Cir.1981). This Court acknowledges evidence of pervasive, intense hostility might qualify as "special circumstances" under *Ford Motor.* This is not such a case. Similarly, characterizing a reinstatement offer as a "litigation tactic", as plaintiff does, could be done in any discharge case. Proof that the offer, if accepted by plaintiff, would not have been honored by defendant, is lacking.

If plaintiff feared returning to work would bring retaliation, plaintiff was obligated to take reasonable steps to address and attempt to resolve the perceived problem. Turner had promised no retaliation would take place, and offered to discuss with plaintiff proposals plaintiff might present on how retaliation could be prevented. In failing to respond to Turner's offer to discuss how retaliation could be prevented, plaintiff failed to act reasonably.

▓▓▓▓ 13. In support of his argument regarding the reinstatement offer, defendant sought to introduce the letters from attorney Thomas Robertson to attorney Katrina Bodenhamer (defendant's exhibits 4, 5 and 6) which set forth and reiterate the offer. Plaintiff objected to admission of the letters and the Court took the objection under advisement. The Court now admits the letters. During the discovery process in this case, plaintiff propounded questions to defendant regarding his consultations with counsel as they related to the decision to make the reinstatement offer (in an effort to demonstrate lack of good faith in the offer.) Defendant objected, citing attorney-client privilege, and a motion to compel was denied. Plaintiff contends the letters are hearsay and self-serving declarations by a lawyer who cannot be cross-examined.

Plaintiff does not describe any alternative method for communicating an offer of reinstatement. With both parties represented by counsel, it would have been improper for defendant to directly communicate the offer to plaintiff. At trial, defendant was available for cross-examination as to his intent and thought processes in formulating the offer.

The only restricted area of inquiry was communications between lawyer and client.

Defendant is not using the attorney-client privilege as "sword and shield", as in the criminal cases cited by plaintiff. Defendant is not selectively revealing privileged communications and protecting others; the letters communicating the offers are not within the privilege. In *Miano v. AC & R Advertising, Inc.*, 875 F.Supp. 204 (S.D.N.Y.1995), after a bench trial, the court, while addressing a *Ford Motor* reinstatement offer, made abundant references to letters *between attorneys* offering reinstatement and responding to the offer.

To the extent the letters constitute hearsay, the Court concludes the requisites of Rules 803(24) and 804(b)(5) F.R.Evid. are satisfied, and the letters properly admitted. Plaintiff had requested that, if the Court admits the Robertson letters, the letters in response by Bodenhamer (plaintiff's exhibits 10 and 11) should also be admitted. The Court so rules, and has considered the Bodenhamer letters as well in its ruling on the reinstatement offer issue.

■ 14. Defendant seeks to exclude plaintiff's exhibit 7, various records from the proceedings before the Oklahoma Employment Security Commission (OESC). Defendant relies upon an Oklahoma statute, 40 O.S. § 2–610A, which directs that no findings, conclusions or final orders of the OESC shall be considered binding upon a subsequent tribunal or be used in evidence in another proceeding. "The governing principle is easily stated. If a [Federal] Rule of Evidence covers a disputed point of evidence, the Rule is to be followed, even in diversity cases, and state law is pertinent only if and to the extent the Rule makes it so." 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure*, § 4512 at 190 (1982) (footnote omitted). Applying Federal Rules of Evidence 803(8) and 401, the Court hereby admits plaintiff's exhibit 7, not as binding prior adjudication, but for such relevance as it has. The Court also admits the EEOC materials (plaintiff's exhibit 6) for such relevance as they have. The Court also admits plaintiff's exhibit 5, hand written notes reflecting the content of the telephone conversation between Ed Gaudin and Turner. Although it does not appear Gaudin actually wrote the notes, he adopted them through his signature. They constitute "recorded recollection" under Rule 803(5) F.R.Evid. 15. The Court has ruled plaintiff is only entitled to lost wages from the date of his suspension on September 22, 1993 through expiration of defendant's reinstatement offer on January 28, 1994. According to the calculation contained in plaintiff's exhibit 14, plaintiff is hereby awarded lost wages in the amount of $4,048.63.

■ Plaintiff also seeks an award for "emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life". *See* 42 U.S.C. § 1981a(b)(3). Compensatory damages may be recovered under the ADA. 42 U.S.C. § 1981a(a)(2). As defendant notes, a mitigating factor is plaintiff's concern during the same time period over his partner's illness and medical care, for which defendant is not responsible. However, plaintiff offered sufficient proof that his improper suspension and discharge exacerbated his existing emotional distress. The relationship was direct, because plaintiff relied on his salary to help care for his partner. The plaintiff is hereby awarded compensatory damages in the amount of $2,500.00.

■ Plaintiff requests an award of punitive damages as well. Such an award may be made if the fact-finder concludes the defendant engaged in a discriminatory practice or discriminatory practices "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Court finds defendant's actions do not rise to this level. Defendant was motivated, in part, by concern that the spreading of rumors, both inside and outside the restaurant, would result in patrons ceasing to dine there. The closing of the French Hen would have resulted in plaintiff, and all other employees, losing their jobs. The ADA requires an employer to tread carefully, observing legal requirements while attempting to maintain customers. While it may be proven in a courtroom that customers' concerns about HIV/AIDS transmission take root in "irrational fears and

stereotypes", a restaurant owner must strike a delicate balance. The Court finds defendant violated the ADA, but did not do so maliciously.

Finally, plaintiff seeks attorney fees pursuant to 42 U.S.C. § 12205. The Court finds plaintiff is the prevailing party in this action and, in its discretion, the Court awards plaintiff reasonable attorney fees and costs. Recovery depends upon proper request and documentation. *See* Local Rules 54.1 and 54.2.

To the extent any of these Conclusions of Law constitute Findings of Fact, they should be so considered.

It is the Order of the Court that judgment be entered for plaintiff and against defendant in the amount of $6,548.63.

### ORDER

Before the Court is the motion of the plaintiff to alter or amend judgment, pursuant to Rule 59(e) F.R.Civ.P. On May 24, 1996, the Court entered Findings of Fact, Conclusions of Law and Order ruling in plaintiff's favor on his claim under the Americans with Disabilities Act. The Court awarded plaintiff $4,048.63 in back pay and $2,500 in compensatory damages. A Judgment was contemporaneously entered in the total amount of $6,548.63 with post-judgment interest at a rate of 5.60% per annum.

 Plaintiff has now filed a Rule 59(e) motion seeking an award of prejudgment interest. Such a motion is a proper vehicle for this request. *See McNickle v. Bankers Life & Casualty Co.,* 888 F.2d 678, 682 (10th Cir.1989).[1] It is established "[u]nder Title VII, a district court is authorized to grant prejudgment interest on a back pay award. Otherwise, the employer would have an 'interest free' loan on wages due, but unpaid." *Daniel v. Loveridge,* 32 F.3d 1472, 1478 (10th Cir.1994) (citations omitted). Title VII remedies are available under the

ADA. 42 U.S.C. § 12117(a). The Court concludes prejudgment interest is available on a back pay award under the ADA as well. Whether prejudgment interest is needed to make a plaintiff whole is within the discretion of the district court. *Hogan v. Bangor and Aroostook R. Co.,* 61 F.3d 1034, 1038 (1st Cir.1995).

 Defendant objects to such an award, on the grounds (1) plaintiff prevailed on a novel theory of which defendant would not have been reasonably aware, (2) defendant is a small company with limited resources, and (3) this Court found defendant did not act maliciously. The Sixth Circuit has held an award of prejudgment interest was not an abuse of discretion, despite no finding of willfulness on the employer's part. *See EEOC v. Kentucky State Police Dept.,* 80 F.3d 1086, 1097–98 (6th Cir.1996). The Second Circuit has gone so far as to state "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award...." *Clarke v. Frank,* 960 F.2d 1146, 1154 (2d Cir.1992). The Tenth Circuit holds that a court must determine whether the equities preclude an award. *See U.S. Industries, Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256–57 (10th Cir.1988). This Court can conceive of situations where the balance of equities would favor denial of prejudgment interest, but this is not one of them. The relatively small amount of money involved should not be overly burdensome to the defendant.

 Once the threshold issue of whether to award prejudgment interest is resolved, the parties appear to implicitly agree on two subsidiary points: (1) the appropriate interest rate is contained in 12 O.S. § 727(A)(2), the Oklahoma statute regarding interest with respect to personal injury awards, and (2) prejudgment interest is appropriately awarded as to the entire amount of the judgment. The Court disagrees with

---

1. Defendant filed a notice of appeal during pendency of the present motion. A notice of appeal filed while a timely Rule 59(e) motion is pending is ineffective to confer jurisdiction on a court of appeals. *Hatfield v. Bd. of Cty. Com'rs,* 52 F.3d 858, 861 (10th Cir.1995). This Court retains jurisdiction. Defendant has made no argument

plaintiff waived an award of prejudgment interest by not requesting it earlier. Rule 54(c) F.R.Cv.P. provides in part: "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the pleadings." The Court will consider the motion.

the parties on both points. First, because plaintiff prevailed on a federal claim, pre-judgment interest should be calculated under a federal standard. *Cf. Goodman v. Heublein, Inc.*, 682 F.2d 44, 46 (2d Cir.1982) ("The award of prejudgment interest under the ADEA is governed by federal, not state, law.") *Eldred v. Consol. Freightways*, 907 F.Supp. 26, 28 (D.Mass.1995). Second, the rationale for awarding prejudgment interest—to make plaintiff whole—only applies to back pay, not compensatory damages. *Cf. Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 961 (1st Cir.1995) (affirming district court's denial of prejudgment interest on front pay award). Therefore, prejudgment interest will only be granted as to the back pay award, which is $4,048.63.

 The sole remaining issue is which federal interest rate to apply. Most courts have applied either (1) 28 U.S.C. § 1961, on the ground prejudgment and postjudgment interest should be calculated on the same basis, or (2) the Internal Revenue Service adjusted prime rate, 26 U.S.C. § 6621, based on the practice of calculating interest on pay awards entered under the National Labor Relations Act. The Court finds persuasive those decisions holding the application of § 1961 provides "the plaintiff is sufficiently, but not overly, compensated." *Ware v. ABB Air Preheater*, 1995 WL 574464 (W.D.N.Y. 1995). The Tenth Circuit, in a non-Title VII case, stated "§ 1961(a) does not necessarily control the award of prejudgment interest in all cases, particularly where historically it has been disallowed." *Frymire v. Ampex Corp.*, 61 F.3d 757, 773 (10th Cir.1995). Prejudgment interest has not historically been disallowed in cases of the present type; this Court takes the *Frymire* statement as sufficient guidance that selecting § 1961 as the appropriate guide is within this Court's discretion.[2]

The Court will adopt the method of calculation used by the parties in their proposals, i.e., apply the single rate of interest to the designated amount, compounded annually. The amount of back pay is $4,048.63. The measuring date is April 19, 1994, the date this action was filed. At a rate of 5.60 percent, the accrued interest for the period of 4/19/94 to 4/18/95 is 226.72. Added to the initial amount of back pay, the resulting total is $4,275.35. The accrued interest on this amount from 4/19/95 to 4/18/96 is 239.42. With this addition, the total becomes $4,514.77. Finally, the accrued interest on this compounded amount is $252.83 for 365 days, or .69 per day. Plaintiff is only entitled to interest from 4/19/96 to 5/25/96, or 35 days. At .69 per day, the amount for the final period is $24.15. The resulting total of back pay and prejudgment interest is $4,538.92. With the $2,500 awarded as compensatory damages added, the total judgment is $7,038.92.

It is the Order of the Court that the motion of the plaintiff to alter or amend judgment (# 61) is hereby granted. An Amended Judgment shall be entered in the amount of $7,038.92.

The application of the plaintiff to establish schedule for filing attorney's fee motion and bill of costs (# 66) is hereby granted. Plaintiff shall file his applications for fees and costs on or before July 17, 1996. No additional extensions of time will be granted.

### AMENDED JUDGMENT

This action came on for bench trial before the Court, Honorable Terry C. Kern, District Judge, presiding, and the decision having been duly rendered,

IT IS THEREFORE ORDERED that the Plaintiff Paul Saladin recover from the Defendant Terry Turner the sum of $7,038.92, with post-judgment interest thereon at the rate of 5.60 percent as provided by law.

---

**2.** By stating § 1961 does not *necessarily control* in all cases, the Tenth Circuit leaves open the inference the statute can appropriately be used in a situation committed to the district court's discretion, such as the present one.