SANCHEZ v LAGOUDAKIS (AFTER REMAND)

Docket No. 106764. Argued April 8, 1998 (Calendar No. 11). Decided
    July 31, 1998.

Dorene Sanchez brought an action in the Branch Circuit Court against
    her employer, Kostas Lagoudakis, doing business as Paradise Fam-
    ily Restaurant, alleging discrimination under the Handicappers'
    Civil Rights Act for requiring her to prove that she was healthy
    enough to continue working after the employer heard a rumor that
    she had AIDS. The court, Michael H. Cherry, J., granted summary
    disposition for the defendant on the ground that because the plain-
    tiff did not have AIDS, she was not handicapped, and the HCRA was
    not applicable. The court conditioned the grant on the payment of
    the plaintiff's lost wages and tips, costs, and attorney fees. The
    Court of Appeals, GILLIS, P.J., and McDONALD and J. W. FITZGERALD,
    JJ., affirmed in an opinion per curiam (Docket No. 115526). The
    Supreme Court reversed and remanded the case to the circuit
    court, holding that AIDS can be a handicap, and that the HCRA pro-
    hibits discriminatory treatment based on an erroneous perception
    of a handicap. 440 Mich 496 (1992). On remand, the circuit court
    granted summary disposition for the plaintiff, while again awarding
    lost wages and tips, and increased the award for costs and attorney
    fees. On remand, the Court of Appeals, DOCTOROFF, C.J., and NEFF
    and FITZGERALD, JJ., affirmed, holding that, with regard to a food-
    service employee, a severely compromised immune system associ-
    ated with AIDS is a determinable physical characteristic of an indi-
    vidual that may result from disease. It held further that, in and of
    itself, the compromised system is unrelated to an individual's abil-
    ity to perform the duties of a waitress or qualification for such
    employment, as long as the characteristic is not accompanied by an
    opportunistic infection in a communicable form that can be trans-
    mitted through contact with food (Docket No. 189094). The defend-
    ant appeals.

    In an opinion by Justice BOYLE, joined by Chief Justice MALLETT,
    and Justices BRICKLEY, CAVANAGH, WEAVER, and TAYLOR, the Supreme
    Court held:

    For the purpose of balancing the Handicappers' Civil Rights Act
    and the Public Health Code, if a food-service employer has a rea-
    sonable suspicion that an employee has AIDS, the employer may

refuse to continue to assign the employee, pending testing for communicable diseases; the employer must have a reasonable basis for the request, and the testing requested must also be reasonable.

1. Under the Handicappers' Civil Rights Act, a handicap is a determinable physical characteristic unrelated to a person's ability to perform the duties of a particular job. A compromised immune system is a determinable characteristic, subject to definite and objective identification. In the context of the food-service industry, depending on the nature of the underlying opportunistic infections, AIDS may or may not be unrelated to the employee's ability to perform requisite duties.

2. The Public Health Code and related administrative regulations are to be read as legislative and administrative policy that define communicable diseases that may be transmitted through food as being related to an employee's duties in a food-service establishment, if the employee works in any capacity in which there is a likelihood that food or food-contact surfaces will be contaminated, or disease transmitted to another person. Under the code and regulations, employers are to exclude from their premises any employee suspected of having a communicable disease. Thus, to the extent that a food-service employee with AIDS suffers from an opportunistic infection that is a communicable disease, and reasonable accommodation will not eliminate the likelihood of contamination of food or food-contact surfaces, or transmission of the disease to another person, the employee is not protected under the HCRA from exclusion. The existence of a severely compromised immune system, or a reasonable suspicion that an employee's immune system has been so compromised, in the context of food handling, will allow an employer to request reasonable testing for communicable diseases, transmissible in a manner described under § 3-101 of the United States Department of Public Health Service, Food Service Sanitation Manual, adopted by 1981 AACS, R 325.25103(b), to ensure compliance with the Public Health Code, to prevent the spread of such diseases, and to determine the employee's status as well as the employer's rights and obligations under the HCRA.

3. In this case, the defendant reasonably requested that the plaintiff prove that she was sufficiently healthy to continue working in the restaurant. The fear that the plaintiff presented a health threat because she might introduce other diseases into the workplace was objectively reasonable because, viewed from the employer's perspective, the plaintiff was the source of the defendant's information. Thus, the suspicion was based on comments

bearing inherent indicia of reliability. As a matter of equity, the plaintiff is entitled to lost wages and tips as a result of this request.

4. Because the plaintiff has not prevailed under the HCRA, she is not entitled to attorney fees as an item of damages under MCL 37.1606(3); MSA 3.550(606)(3) or as an item of costs under MCR 2.625.

Reversed and remanded.

Justice KELLY, dissenting, stated that an employer is expected to send an employee home from work where there is evidence of a communicable disease that is transmitted through food or in the process of preparing and serving food or beverages. Also, an employer may require medical clearance to return to the workplace. However, requiring an employee to be tested on the basis of a suspicion of being afflicted with AIDS runs afoul of the HCRA and ADA's proscription against medical examinations that are not job-related and not required by business necessity. Requiring only those suspected of having AIDS and other compromised immune system diseases to be tested for communicable diseases, absent some discernible evidence of a food-borne illness, clearly is a violation of the HCRA.

Whether an action is reasonable is not a matter of law, but is a question for the jury. The trial court and the Supreme Court err in resolving the question on a motion for summary disposition. If the question is resolved as a matter of law, it must be found that the defendant's request that Sanchez be tested was not based on a reasonable suspicion that she harbored some AIDS-associated communicable disease; rather, it was based on rumor and innuendo and his own fears. This is insufficient to justify the type of discriminatory behavior that the defendant perpetrated in this case.

217 Mich App 535; 552 NW2d 472 (1996) modified.

*Granzotto & Nicita, P.C.* (by *Mark Granzotto*), and *Michael J. Steinberg* for the plaintiff-appellee.

*George James Platsis* for the defendant-appellant.

Amici Curiae:

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Cynthia M. Nuñez*, Assistant Attorney General, for Department of Civil Rights.

*Chris E. Davis* and *Kendra S. Kleber* for Michigan Protection & Advocacy Service, Inc., AIDS Partnership Michigan, HIV/AIDS Wellness Networks Grand Traverse Area, Inc., HIV/AIDS Resource Center, FRIENDS Alliance, Michigan Jewish AIDS Coalition, AIDS Resource Center, and AIDS Consortium of Southeastern Michigan, Inc.

AFTER REMAND

BOYLE, J. We granted leave in this case to decide whether the Court of Appeals properly determined the parties' rights under the Handicappers' Civil Rights Act (HCRA)[1] and certain provisions of the Public Health Code.[2] We hold that the Court of Appeals failed to properly balance the interests underlying the applicable statutes and regulations. We also hold that the Court of Appeals erred in sustaining the trial court's award of attorney fees.

We emphasize at the outset that the lengths to which we go in limiting this opinion by explaining what it is *not* about, are made necessary by the dissent's accusation that "the opinion permits discrimination" against persons affected or suspected of being affected by AIDS. *Post* at 729. This characterization of our holding raises the specter of alarming a segment of the community already subjected to unnecessary hysteria. That possibility is the inherent consequence of the dissent's unfortunate failure to recognize that what divides us is (1) whether the Public Health Code and regulations address solely food-borne illnesses, (2) whether a food-service employer must wait for

[1] MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*
[2] MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*

physical symptoms to manifest before refusing to
assign an employee where there is a reasonable suspi-
cion of AIDS, and (3) that this case involves a reasona-
ble suspicion having inherent indicia of reliability as
opposed to mere rumor and innuendo. We have done
everything possible from the judicial perspective to
define a path by which employers and employees may
in good faith navigate two complex and difficult sets
of statutory obligations. Mindful of Cardozo's admoni-
tion that we are not knights-errant, roaming at will in
pursuit of our own ideal of truth and goodness, we
refrain from attempting to redefine these obligations
in favor of a particular group or personal perspective.
Cardozo, The Nature of the Judicial Process, p 141.

Our focus here is limited and does not concern the
transmission of AIDS. Rather, our decision addresses
the obligations of food-service employers and employ-
ees in the presence of the potential spread of underly-
ing communicable diseases that may be associated
with AIDS.[3] A food-service employer is not free to ter-
minate any employee with a suspected illness, pend-
ing evidence that the employee is disease free. The
employer is not free to terminate an employee for a
suspected illness that is unrelated to the employee's
ability to perform a job, and, ipso facto, is not free to

---

[3] The approach advocated by the dissent would ignore those food ser-
vice industry patrons and coemployees, who themselves have compro-
mised immune systems, including those who have AIDS. The Public Health
Code was enacted and designed to protect not just the healthy, but also
those with compromised immune systems and other susceptible individu-
als. To require that persons with AIDS remain in a food-service capacity
until they demonstrate symptoms of a communicable disease could not
only put healthy patrons at risk, but could also threaten those susceptible
patrons who might patronize a food-service establishment with the expec-
tation that reasonable action has been taken to protect them from poten-
tial food-borne and airborne illnesses.

require an employee to present evidence of being disease free. However, where a food-service employer has a reasonable suspicion that a food-service employee has AIDS, which by definition is a syndrome that involves a compromised immune system that renders the employee highly susceptible to diseases that might be communicable in a manner described under the relevant regulations, the food-service employer may refuse to continue to assign the employee, pending testing for such communicable diseases. In this unique setting, where one accepted definition of AIDS is that it involves certain associated diseases, some of which are infectious and possibly food borne or airborne,[4] our result is consistent with the fact-specific inquiry dictated by the need to avoid significant health risks to the public while protecting the handicapped from sweeping generalizations based on prejudice or unfounded fears.

We reverse the decision of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

I

Plaintiff Dorene Sanchez was working as a server at defendant Kostas Lagoudakis' Paradise Family Restaurant in Coldwater. A rumor circulated in late 1987 that she had AIDS.[5] Mr. Lagoudakis directed

---

[4] We note that plaintiff's brief concedes that "one definition of AIDS is that it occurs when an individual is seropositive for HIV *and* has one of certain associated illnesses, and . . . some of the associated illnesses are infectious and possibly food-borne . . . . AIDS is defined as occurring when an individual with HIV contracts any one of a multitude of possible opportunistic infections."

[5] The source of the rumor has not been conclusively identified. The defendant presented the testimony of a customer, who stated that plaintiff herself was the first to mention the possibility that she was ill. Plaintiff

Ms. Sanchez to prove that she was healthy enough to continue working in the restaurant. He told her that she was free to return if she proved she was healthy. Plaintiff returned with proof that she did not have AIDS, and defendant told her she could return to work.[6] However, she complains that his action was a discharge.

Ms. Sanchez filed suit, alleging discrimination in violation of the Handicappers' Civil Rights Act (HCRA).[7] However, the circuit court granted summary disposition in favor of Mr. Lagoudakis on the ground that, because Ms. Sanchez did not have AIDS, she was not handicapped and the HCRA was inapplicable.

---

admits that the rumors started before defendant's request for a certification of good health and does not allege or maintain that defendant was personally responsible for starting the rumors by sending her for testing or otherwise. Plaintiff attributes her refusal to return to work to the existence of the rumors about her health and the fact that defendant would tell customers she did not have AIDS if they expressed further concern.

[6] The record reveals that whether defendant actually stated that an "AIDS test" was required is disputed by the parties. In the circumstances of this case, we find resolution of that issue irrelevant to our decision. As we read the record, defendant sent plaintiff to obtain proof that she could continue working without posing a health risk to his customers and employees. Had plaintiff returned with a positive AIDS test, but no relevant communicable disease, or a condition that could reasonably be accommodated under the circumstances, the case would be entirely different.

The dissent's selective quotations from the testimony of the defendant are irrelevant to the only evidentiary question before us, that is, whether the defendant had a reasonable suspicion. Although the dissent does acknowledge, as it should, that defendant testified that he knew AIDS is associated with communicable diseases such as cryptosporidia, salmonella, and pneumonia, we can only conclude that the portrait of employer villainy the dissent draws is for an alarmist purpose. Given that the basis for the defendant's suspicion was credible and reasonable, his fears are relevant only in the sense that they reinforce the need for medical input so that an unschooled layperson has professional assistance in evaluating the relatedness of the employee's condition.

[7] MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*

Citing "equitable" powers, the circuit court conditioned the grant of summary disposition on payment by Mr. Lagoudakis of $491.25 for Ms. Sanchez' lost wages and tips, $316.24 in costs, and $500 for attorney fees, for a total of $1,307.49.

Both parties appealed, and the Court of Appeals affirmed. 184 Mich App 355; 457 NW2d 373 (1990).

On appeal to this Court, the grant of summary disposition in favor of Mr. Lagoudakis was reversed. 440 Mich 496; 486 NW2d 657 (1992). This Court said that AIDS can be a handicap, and that the HCRA prohibits discriminatory treatment based on an erroneous perception of a handicap. We remanded the case for further proceedings:

> Because AIDS can be found to be a handicap under the Handicappers' Civil Rights Act, and because the act prohibits discriminatory treatment, even when based on erroneous perception, we reverse the decision of the Court of Appeals and remand this case to the circuit court for further proceedings.
>
> On remand the circuit court shall determine whether the condition Sanchez was perceived to have was a determinable physical characteristic resulting from disease unrelated to her ability to perform the duties of her job or her qualifications for employment or promotion. Both of these questions are for further factual development and determination. No record is presented on which we might express an opinion. [440 Mich 506-507.][8]

In the opinion, we emphasized that this Court was not considering the propriety of the "equitable" award in favor of Ms. Sanchez, 440 Mich 498, n 5, and that

---

[8] The record of proceedings below now includes the transcript of an evidentiary hearing on plaintiff's motion for summary disposition that allows us to make a more complete review.

we were expressing no opinion with regard to whether AIDS is unrelated to Ms. Sanchez' food-service employment. 440 Mich 502, n 14.

On remand, the circuit court granted summary disposition in favor of Ms. Sanchez, while again awarding $491.25 in damages. The court increased the costs from $316.24 to $725.24, and awarded the plaintiff $32,501.34 in attorney fees.

Mr. Lagoudakis appealed, and the Court of Appeals affirmed in a lengthy opinion. 217 Mich App 535; 552 NW2d 472 (1996). We granted Mr. Lagoudakis' application for leave to appeal, and we now directly address the issue whether AIDS, or the perception thereof, was unrelated to Ms. Sanchez' employment.

II

In its opinion affirming the decision of the trial court, the Court of Appeals offered a detailed analysis of the central issues presented in this case. 217 Mich App 538-557. However, the Court's holdings are well summarized in these passages:

> For the foregoing reasons, we hold that, with regard to a food-service employee, a severely compromised immune system associated with AIDS is a determinable physical characteristic of an individual that may result from disease and that is unrelated to an individual's ability to perform the duties of a waitress or to an individual's qualification for such employment as long as this characteristic is not accompanied by an opportunistic infection in a communicable form that can be transmitted through contact with food. In other words, a food service employee with AIDS has a handicap within the meaning of the HCRA. [217 Mich App 552.]

> On the record before us, we conclude that defendant's suspension of plaintiff violated the HCRA because the sus-

pension constituted an unlawful discriminatory act taken in response to a handicap that was unrelated to plaintiff's abilities to perform her duties as a waitress. Accordingly, we reject defendant's claim that plaintiff did not establish, as a matter of law, a prima facie case of discrimination under the HCRA and his corresponding claim that he was entitled to summary disposition with regard to plaintiff's HCRA claim. [217 Mich App 554.]

The Court of Appeals has held that "with regard to a food-service employee, a severely compromised immune system associated with AIDS is a determinable physical characteristic of an individual that may result from disease and that is unrelated to an individual's ability to perform the duties of a waitress or to an individual's qualification for such employment as long as this characteristic is not accompanied by an opportunistic infection in a communicable form that can be transmitted through contact with food." 217 Mich App 552. We agree.

However, there is only one method by which a typical restaurateur will be able to determine reliably whether an employee's condition is "accompanied by an opportunistic infection in a communicable form that can be transmitted through contact with food." That method would be to send the employee to a physician for testing.[9] And that is precisely what the employer did in this case.[10]

---

[9] In this regard, the dissent misses the mark completely. While the dissent would refuse to restrict an employee from a food-service job " 'unless they have evidence of other infection,' " *post* at 733, we have merely found that identification of such other infections, without exposing other employees or patrons to a risk of infection, may require the input of a medical professional.

[10] We find that nothing in our decision is inconsistent with the policies and regulations referenced by the dissent, and we have not located any decision in our research or the parties' briefs that holds to the contrary.

The Court of Appeals has attempted to balance a food-service employer's statutory obligation not to discriminate against an employee[11] and the employer's statutory obligation to provide a healthy environment for diners and other patrons.[12] However, to accomplish this balance—to assure continued employment opportunity in the absence of "an opportunistic infection in a communicable form that can be transmitted through contact with food"—we hold that where a food-service employer has a reasonable suspicion that an employee has AIDS, the employer has the right to ask that employee to undergo testing to determine whether an opportunistic infection in a communicable form is, in fact, present.[13] We restrict our holding

Indeed, § 103(d) of the Americans with Disabilities Act requires the United States Department of Health and Human Services to publish a list of infectious and communicable diseases that are transmissible through food handling. In its list of "Diseases Transmitted Through the Food Supply," 56 FR 40897, the department states that "appropriate measures undertaken to protect the public's health from non-foodborne diseases should not be constrained by [the] list." *Id.* at 40898. Because AIDS may involve underlying infections that are airborne, our decision is consistent with the department's reasoning in this regard.

[11] MCL 37.1202(1)(b); MSA 3.550(202)(1)(b).

[12] MCL 333.12909(1); MSA 14.15(12909)(1). See also 1981 AACS, R 325.25103(b) (adopting the United States Public Health Service "Food Service Sanitation Manual"); 1981 AACS, R 325.25909(3).

[13] *This suit was brought under state law. However, we note that federal law provides that an employer "may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." 29 CFR 1630.14(c). Because "AIDS destroys the body's immune (defense) system and allows otherwise controllable infections to invade the body and cause additional diseases," Surgeon General's Report on Acquired Immune Deficiency Syndrome (1986), some of which may manifest themselves in a communicable form (such as pneumonia, tuberculosis, salmonella, etc.), we find that a medical examination to determine whether such communicable diseases may be present as a manifestation of AIDS, where the employer has a reasonable suspicion of the presence of AIDS, to be consistent with the federal standard and the requirements of the HCRA and the Public Health Code. Thus, we expressly disagree with*

to the task of balancing the HCRA and the Public Health Code.

A

The applicable legislation and administrative rules support our holding. MCL 37.1103(b)(i); MSA 3.550(103)(b)(i), at the relevant time,[14] defined "handicap" as

> a determinable physical or mental characteristic of an individual or a history of the characteristic which may result from disease, injury, congenital condition of birth, or functional disorder which characteristic . . . is unrelated to the individual's ability to perform the duties of a particular job or position, or is unrelated to the individual's qualifications for employment or promotion.

We agree with the Court of Appeals that "a compromised immune system constitutes a 'determinable' characteristic . . . subject to definite and objective identification by serological, histological, and cultural techniques." 217 Mich App 542. However, "[a] disability that is related to one's ability to perform the duties of a particular position is not a 'handicap' within the meaning of the [HCRA]."[15] Under the HCRA in the context of the food service industry, AIDS is unique because, depending on the nature of the underlying opportunistic infections that present themselves as

the Court of Appeals construction of the relationship between the two acts.

[14] The HCRA has been amended since the events giving rise to this case.

[15] *Rymar v Michigan Bell Telephone Co*, 190 Mich App 504, 506; 476 NW2d 451 (1991) (MARILYN KELLY, J.) (citing *Carr v General Motors Corp*, 425 Mich 313, 321-322; 389 NW2d 686 [1986]); see also *Jesson v General Telephone Co v Michigan*, 182 Mich App 430, 433; 452 NW2d 836 (1990); *Ashworth v Jefferson Screw Products, Inc*, 176 Mich App 737, 743; 440 NW2d 101 (1989).

the syndrome's natural process destroys the immune system, AIDS may or may not be unrelated to the employee's ability to perform duties in the food service industry.[16] Surgeon General's Report on Acquired Immune Deficiency Syndrome (1986).

The Public Health Code and administrative regulations promulgated thereunder mandate certain procedures if a food-service employee is suspected of hav-

---

[16] The Court of Appeals aptly described how a diagnosis of AIDS is made:

> A diagnosis of AIDS is not a diagnosis of a single medical condition or illness. An AIDS diagnosis can be made where there is serological or cultural evidence of HIV infection *and the presence of any of a number of specific opportunistic diseases.* Gordy-Gray, 2 Attorney's Textbook of Medicine, ¶ 46.31, p 46-28. In the absence of serological evidence of HIV infection, a diagnosis of AIDS can be made when an opportunistic infection indicative of defective cellular immunity or Kaposi's sarcoma occurs in a person with no immunocompromising disease and who is receiving no immunocompromising therapy. 2 Attorney's Textbook of Medicine, pp 46-27 to 46-28. As the publications of the Center for Disease Control, the Michigan Public Health Department, and the National Restaurant Association relied upon by the parties indicate, there is the potential for a person with a severely compromised immune system to harbor either an opportunistic infection in a communicable form that can be transmitted by contact with food or organisms that cause such a disease. [217 Mich App 551-552 (emphasis added).]

The Court of Appeals added Gordy-Gray's list of the potential opportunistic infections, which "include pneumocystis carinii pneumonia, crytosporidiosis, round worm infestation, toxoplasmosis, Candida esophagitis, cryptococcal infection, Atypical mycobacteriosis, cytomegalovirus, herpes simplex virus, and progressive multifocal leukoencephalopathy." *Id.* at 551, n 4. See also Surgeon General's Report, *supra.*

1 Attorneys' Dictionary of Medicine and Word Finder, p A-202, states that "persons affected with the syndrome have a suppressed immunity mechanism, i.e., they have no resistance to infections," and it adds meningitis and encephalitis to the list of opportunistic infections. Documents from the Centers for Disease Control submitted to the Court also add salmonella.

ing a "communicable disease." MCL 333.12909(1);
MSA 14.15(12909)(1) provides:

> The department shall promulgate rules to prescribe crite-
> ria for programs by local health departments and proce-
> dures for the administration and enforcement of this part.
> The department may promulgate rules to prescribe mini-
> mum standards of sanitation for the protection of the public
> health and otherwise provide for the implementation of this
> part. The department in promulgating these rules shall seek
> the advice and counsel of local health departments and the
> food service industry.

The Michigan Department of Public Health, pursu-
ant to its authority to promulgate administrative regu-
lations, adopted most provisions of the United States
Department of Public Health Service, Food Service
Sanitation Manual. See 1981 AACS, R 325.25103(b).
Section 3-101 of that manual states:

> No person, while infected with a disease in a communica-
> ble form that can be transmitted by foods or who is a car-
> rier of organisms that cause such a disease or while
> afflicted with a boil, an infected wound, or an acute respira-
> tory infection, shall work in a food service establishment in
> any capacity in which there is a likelihood of such person
> contaminating food or food-contact surfaces with patho-
> genic organisms or transmitting disease to other persons.[17]

---

[17] The statements surrounding the dissent's footnote 2 are simply
wrong. Section 3-101, by its express terms, plainly contemplates transmis-
sion of communicable diseases in manners other than solely through food
by virtue of its mention of boils, infected wounds, and acute respiratory
infections. Indeed, were it to contemplate only food-borne transmission,
and not airborne illness as well as any other risk of "transmitting diseases
to other persons," the regulation would be useless in practical terms. Fur-
thermore, the dissent's logic is entirely flawed because it ignores 1981
AACS, R 325.25909(3), which, by its express terms, contemplates all sus-
pected communicable diseases, and, thus, cannot be restricted only to dis-
eases spread through food. Indeed, the dissent contradicts itself. At p 730
the dissent states that "[the dispositive question] is whether the food-ser-

1981 AACS, R 325.25909(3) further provides:

> The owner, operator, or person in charge of a food ser-
> vice establishment shall exclude from the food service
> establishment any employee with a suspected communica-
> ble disease.

The manual's reference to exclusion from the estab-
lishment of a "person . . . infected with a disease in
a communicable form that can be transmitted by
foods or who is a carrier" contemplates just the kind
of exclusion involved in this case. In the presence of
a suspicion as referenced in 1981 AACS, R
325.25909(3), sending the employee for testing is a
reasonable and prudent procedure to identify what
should be done next. We read the Public Health Code
and administrative regulations thereunder, as did the
Court of Appeals, as a legislative and administrative
policy decision to define communicable diseases that
may be transmitted through food as *related* to the
employee's duties in the food service establishment-
service establishment if the employee works in any
capacity in which there is a likelihood that the person
will contaminate food or food-contact surfaces, or
transmit a disease to another person.[18] Moreover,

---

vice worker is sick with a communicable disease that can be transmitted
through food." However, at p 736, the dissent concedes that the true
inquiry, as we have said all along, concerns transmission "through food or
in the process of preparing and serving food or beverages."

[18] The HCRA did not define "unrelated to the individual's ability" in the
version of the act in effect before 1990. However, in 1990, the Legislature
clarified the meaning of this phrase as applicable where "with or without
accommodation, an individual's handicap does not prevent the individual
from . . . performing the duties of a particular job or position." MCL
37.1103(l)(i); MSA 3.550(103)(l)(i).

Thus, the law in Michigan, by providing that the inquiry into relatedness
turns, in part, on whether reasonable accommodation will allow the

because few restaurant owners or operators possess medical or public health training, the law requires such employers to exclude from the premises any employee suspected of having a communicable disease.[19] This reasonable requirement is clearly

---

employee to continue to work without presenting an undue hardship is consistent with federal law:

> A person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk. [*Nassau Co, Florida School Bd v Arline*, 480 US 273, 287, n 16; 107 S Ct 1123; 94 L Ed 2d 307 (1987).]

In other words, as the *Arline* Court noted:

> The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all persons with* actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." [*Id.* at 285.]

Our rationale should not be construed to mean that all persons with communicable diseases are excluded from the HCRA. The Public Health Code allows food-service employers to require that persons reasonably suspected of having a severely compromised immune system see a doctor. This will allow the employee's condition to be "evaluated in light of medical evidence," *id.*, and notify both parties how they should proceed under the HCRA and other applicable law.

The dissent accuses us of making "a medical decision." However, the point of our decision is that where there is reasonable cause to suspect AIDS, the crucial determination of how to evaluate a food-service employer's rights and obligations under the Public Health Code and to protect the employees rights under the HCRA should be subject to the sound initial evaluation of a medical professional. In short, our decision simply authorizes an employer to require an employee to make sure it is medically reasonable for the employee to continue working in the food service establishment, given the risk of the manifestation of communicable diseases. The dissent would prevent an employer from requiring that such advice be sought.

[19] Our decision is consistent with the reasoning of the Supreme Court in its recent decision regarding HIV under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.* In *Bragdon v Abbott,* 524 US __; 118 S Ct

designed to protect the public and the restaurant staff, as well as to encourage identification of persons carrying communicable diseases, including those that may be transmitted through food. Thus, to the extent that a food-service employee with AIDS suffers from an opportunistic infection that is a communicable disease,[20] and reasonable accommodation will not elimi-

---

2196; 141 L Ed 2d 540 (1998), the Court addressed the question whether, under the ADA, courts should "defer to the health care provider's professional judgment, as long as it is reasonable in light of then-current medical knowledge?" *Id.*, 118 S Ct 2209-2210. The Court found the question, as it relates to health care professionals, involves two levels of inquiry: (1) whether the judgment was, indeed, reasonable, and (2) whether courts should defer to that judgment. *Id.*, 118 S Ct 2210. The Court unanimously agreed that "[t]he existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation . . . ." *Id.*, 118 S Ct 2210, 2216. The Court also referenced *Arline, supra,* and concluded that it "reserved the possibility that employers could consult with individual physicians as objective third-party experts." *Bragdon,* 118 S Ct 2210. We find this reasoning consistent with our understanding of the relationship between the HCRA and the Public Health Code. The *Bragdon* Court, like the Public Health Code and regulations thereunder, recognizes differing levels of sophistication that exist between professionals in public health or health care and food-service employers, such as the defendant here and the defendant in *Arline.* Thus, *Bragdon* imposes a standard of objective reasonableness in light of current medical knowledge on health care professionals while recognizing the *Arline* Court's appropriate observation that less sophisticated employers, like defendant here, may require the expert assistance of a physician to determine whether and to what extent an employer may allow an employee to continue to work. In balancing the HCRA and the Public Health Code, we find that a "reasonable" suspicion of AIDS standard best effectuates the intent underlying both acts. We note, however, that what is objectively reasonable for a health care professional will not necessarily be the same as what is objectively reasonable for a lay employer.

[20] We refrain from reviewing what the phrase "communicable disease" means under 1981 AACS, R 325.25909(3) except to the extent that we recognize it includes many opportunistic viral or bacterial infections to which AIDS renders a person susceptible. Section 3-101 of the "Food Service Sanitation Manual" references only a "disease in a communicable form that can be transmitted by foods . . . [by a person working] in any capacity in which there is a likelihood of . . . contaminating food or food-contact surfaces with pathogenic organisms or transmitting disease to other persons." Our decision is limited only to those communicable dis-

nate the likelihood of contamination of food or food-contact surfaces, or transmission of the disease to another person, the food service industry employee is not protected under the HCRA from exclusion.[21]

However, we disagree with the Court of Appeals result because we find it unworkable. Given that AIDS involves the destruction of the immune system, the least intrusive way to reliably detect such opportunistic infections in a highly susceptible employee and prevent their transmission consistent with the Public Health Code, as well as to determine whether an individual employee's AIDS is related or unrelated to job duties, is to permit employers to require employees to be tested for communicable diseases on the basis of a reasonable suspicion of the presence of AIDS.

---

eases that fall under § 3-101. As a general proposition, AIDS itself is not a communicable disease as described in § 3-101, although as a syndrome it may involve such diseases, thus requiring consideration of the employer's obligations under the public health code. Because there can be no serious dispute over whether tuberculosis, salmonella, pneumonia, meningitis, etc., are communicable diseases, or whether the law would require exclusion of a person suspected of carrying such infections in the absence of the AIDS question, we need not review the phrase further.

[21] Our holding is consistent with the opinion of the Michigan Department of Public Health, as stated in a letter presented in the materials submitted to this Court. The letter is authored and signed by an individual carrying the title "Food-service Specialist, Food-service Sanitation and Program Consultation Section, Division of Environmental Health, Bureau of Environmental and Occupational Health." The letter states, in response to an "inquiry regarding AIDS in the food-service work place":

The position of the Centers for Disease Control, Public Health Service, on this issue was outlined in the November 15, 1985, issue of Morbidity and Mortality Weekly Report . . . . The National Restaurant Association also prepared a current issues report on this subject . . . . Each of these observe that "food service workers known to be infected with (AIDS) need not be restricted from work unless they have evidence of other infection for which any food service worker would also be restricted."

Our holding is consistent with the position outlined in the brief submitted by the Attorney General as amicus curiae, to the extent that our holding requires that employers treat individual employees case by case in assessing their present ability to perform job duties, that any required medical tests must directly relate to specific job duties, and that employers are required to act in accordance with the HCRA. However, we reject the Attorney General's request that we affirm the decision of the Court of Appeals because we find the defendant's actions here consistent with a reasonable balancing of the employer's obligations under the HCRA and the Public Health Code. Considering a food-service employer's obligation not to discriminate under the HCRA and his concomitant obligation to prevent the spread of communicable diseases in the workplace, and considering the fact that AIDS, by destroying the immune system, renders those affected highly susceptible to some communicable diseases that may be spread through food, the only way an employer can attempt compliance with both obligations is by sending the employee for a physical examination and testing where the employer reasonably suspects the presence of AIDS *or any other medical condition, that, by definition, might render a food-service employee highly susceptible to such infections.*[22] Thus, we disagree with the dissent's con-

---

[22] The dissent accepts the definition of AIDS that states that it involves HIV infection plus an underlying opportunistic infection that may be a communicable disease. However, the dissent erroneously states that, under our decision today, "an employer may require any person suspected of being afflicted with AIDS or another compromised immune system disease to be tested for communicable disease." *Post* at 729. We have restricted our discussion herein to AIDS or any other medical condition that, *by definition*, might render an employee highly susceptible to such infections.

tention that our holding "clearly discriminates." We do not hold that a food-service employee may be required to reveal HIV/AIDS status, but, consistent with 1981 AACS, R 325.25909(3), only that where the employer reasonably suspects the presence of AIDS, he may require testing for infectious diseases.[23]

In summary, our opinion is restricted to the food service industry context. We agree with the Court of Appeals that a severely compromised immune system as a result of HIV infection, "in and of itself, is unrelated to an individual's ability to satisfactorily perform the duties of a waitress in a food service establishment within the meaning of the HCRA."[24] 217 Mich App

---

[23] We note again that AIDS is a complex syndrome, the very definition of which involves a severely compromised immune system that renders the AIDS patient susceptible to diseases that may be transmissible as outlined in the applicable regulations. Cancer, for example, does not involve such susceptibility by definition, and, contrary to the dissent's characterization of our decision, we are not deciding issues relevant to conditions other than those that involve immunosuppression by definition. Treatment of the myriad issues raised by the dissent will have to wait for cases presenting those issues directly to the Court for review.

[24] We again note that there is a difference between a person's HIV status and their AIDS status. We acknowledge the information gap in educating the public with current medical knowledge regarding HIV and AIDS that will allay false perceptions that may lead to unlawful discrimination. We are also aware of the concern that a given employer who lacks knowledge regarding the noncommunicability of HIV could react unreasonably or hysterically to the idea that an employee was infected. We have not received briefing in this case from public health authorities; thus, we are not aware of what position they would take with regard to HIV. However, we note that an attempt to apply the regulations relevant to this opinion to HIV-status might raise serious questions regarding the reasonableness of the regulations under state and federal constitutional law, unless the employee's duties present "a direct threat to the health and safety of other workers . . . ." See *EEOC v Prevo's Family Market, Inc*, 135 F3d 1089, 1095 (CA 6, 1998). Our decision does not apply to an individual infected with or suspected of carrying HIV without a reasonable suspicion of the presence of AIDS. An individual may be HIV positive for years or even indefinitely without developing AIDS. Mere HIV positive status, or suspicion thereof, is not the circumstance presented here.

551. However, AIDS is related to an employee's ability to perform a food service industry job where it is (1) accompanied by an opportunistic infection that is a communicable disease transmissible in a manner described under § 3-101 of the Food Service Sanitation Manual and (2) reasonable accommodation to remove the likelihood of such transmission is not possible.[25] Thus, the existence of a severely compromised immune system, or a reasonable suspicion that an employee's immune system has been so compromised, in the context of food handling, will allow the employer to request reasonable testing for communicable diseases transmissible in a manner described under § 3-101 to ensure compliance with the Public Health Code, to prevent the spread of such diseases, and to determine the employee's status under the HCRA, as well as the employer's rights and obligations thereunder.[26] To hold otherwise would, in effect,

[25] This conclusion does not authorize an employer to discriminate against an employee on the basis of a perception of AIDS, but, rather, provides the parties with the only reasonable avenue by which they may determine their rights and obligations under the Public Health Code and the HCRA. Once the determination regarding the existence of any underlying communicable disease transmissible as set forth in § 3-101 is made, the parties may proceed under the code and the act to determine the appropriate accommodation or exclusion. See, e.g., MCL 37.1606(5); MSA 3.550(606)(5), and MCL 37.1210(18); MSA 3.550(210)(18), added by the Legislature in 1990, which provide that a handicapper may not bring a civil action for failure to accommodate unless the employer is first informed of the need for accommodation. Sending an employee for testing under circumstances such as those presented here is a minimally intrusive course of action allowing both parties to determine facts essential to subsequent evaluation of their respective legal rights and obligations.

[26] Thus, we also agree with the Court of Appeals insofar as it does not "exclude the possibility that under some circumstances a severely compromised immune system could constitute a characteristic related to an individual's ability to perform the duties of, or qualify for employment as, a waitress." 217 Mich App 551. However, we reverse the Court of Appeals decision because we find its application of the principles discussed unworkable from a practical standpoint.

"impose upon [the employer] a duty to become an expert in the field of [disease] transmission and control." See *EEOC v Prevo's Family Market, Inc*, 135 F3d 1089, 1097 (CA 6, 1998) (the defendant did not violate the ADA by requiring an employee infected with HIV to seek medical examination where the employee worked with sharp knives in proximity to other persons in an environment where bleeding was common).

B

There are a number of ancillary questions that we need not address today.[27] However, we find that, in the circumstances of this case, Mr. Lagoudakis reasonably requested that Ms. Sanchez prove she was healthy enough to continue working in the restaurant. Considering defendant's actions, and all the circumstances giving rise to this case, including the historical time in which these events occurred, defendant's fear that plaintiff presented a health threat because she might introduce other diseases into the workplace was objectively reasonable, given the information the lay employer had in 1987.[28] Although the

---

[27] Thus, we do not outline all the circumstances in which a food-service employee may be requested to undergo testing to prove being healthy enough to return to work. Nor do we determine what health testing may reasonably be requested of a food-service employee with AIDS, or the interval at which such testing may be requested. We also do not address what reasonable accommodations are required for a food-service employee with AIDS or an opportunistic infection that may be transmitted through food, if any. Although we have no occasion to evaluate the effect of a series of requests, we caution that the exercise of a legitimate right may become illegitimate if abusively employed.

[28] Because of the restaurateur's obligations under the Public Health Code to "exclude from the food service establishment any employee with a suspected communicable disease," we conclude, as a matter of law, that, under the circumstances presented here, merely requesting that an employee seek confirmation of the absence of the types of communicable

source of the rumors is unclear, both parties acknowledge their existence and that they were reported to defendant by customers and staff. Analyzing defendant's suspicion from his point of view, defendant's suspicion rises to the level of a reasonable suspicion as a matter of law. It was not inherently incredible, and defendant's information at the time, corroborated by a witness defendant produced, was that plaintiff was the source of the rumors. Thus, from the employer's perspective, the rumor had inherent indicia of reliability.[29]

We further find, as a matter of equity, that Ms. Sanchez is entitled to the modest amount of the wages and tips that she lost as the result of Mr. Lagoudakis' request.[30] MCR 7.316(A)(7).

III

The Court of Appeals upheld the award of $32,501.34 in attorney fees for the lawyers who were able to obtain $491.25 in money damages for Ms.

---

diseases recognized in § 3-101 does not constitute a violation of the HCRA. However, consistent with our observation that a case-by-case evaluation is required in this highly sensitive area, we recognize that in some cases there may be a question of fact regarding whether the employer's allegation of suspicion is credible and reasonable. On the unique facts of this case, however, we conclude only that defendant's suspicion was sufficiently reliable and reasonable under the standard set forth in 1981 AACS, R 325.25909(3) where defendant testified and offered the corroborating testimony of a customer that plaintiff herself started the rumor.

[29] We are not called upon to answer the question whether 1981 AACS, R 325.25909(3) is overbroad and have no information about how it is actually applied. We note only for the purposes of this case that the employer's suspicion had a rational basis.

[30] We do not hold that, in all circumstances, a food-service employer must offer paid leave during the pendency of any requested testing. However, in this circumstance, as a matter of equity, paid leave would have represented an appropriate balancing of the employer's statutory obligations. Paid leave also reduces the danger of abuse because the employer decides whether to request testing.

Sanchez. We vacate the award of attorney fees. Although we have affirmed the trial court's award of wages and tips on equitable grounds, plaintiff has not prevailed under the HCRA. Thus, plaintiff is not entitled to attorney fees as an item of damages under the HCRA, MCL 37.1606(3); MSA 3.550(606)(3), or as an item of costs under MCR 2.625.

IV

We reverse the Court of Appeals decision, and we remand this case to the circuit court for entry of an appropriate order dismissing plaintiff's case with prejudice and ordering defendant to compensate plaintiff for her lost wages and tips. No costs shall be taxed, a public question being involved.

MALLETT, C.J., and BRICKLEY, CAVANAGH, WEAVER, and TAYLOR, JJ., concurred with BOYLE, J.

KELLY, J. (*dissenting*). This case was resolved by the trial court on cross-motions for summary disposition pursuant to MCR 2.116(C)(10) following an evidentiary hearing. To determine if summary disposition was properly granted to Dorene Sanchez, it is necessary to view the facts in a light most favorable to the defendant.

At the hearing, a customer of the restaurant and a casual friend of Sanchez testified. She said that Sanchez "thought she was with someone that had—possibly had AIDS." Other customers overheard the remark and, within a few weeks, a group of people from the local church refused to let Sanchez serve food to them. The friend betrayed Sanchez' confidence, telling other friends and defendant. Defendant was "terrified" because "AIDS is a big thing. I got kids

into my place. I got family. . . . It's something really scare me." In fact, defendant testified that "[i]f somebody come close to me and I know he has AIDS, I'm going to run away. . . . Even if I see the picture with AIDS, I don't want to touch him."

There is no evidence in the record of this case that Sanchez was unhealthy. However, defendant laid her off until she produced proof that defendant could show his customers that she was "healthy from AIDS." Sanchez produced the test results for her employer, but objected to his showing them to customers.

The majority's opinion sanctions defendant's conduct, holding that testing was permissible since defendant had a reasonable suspicion that Sanchez had AIDS. The holding is flawed for two reasons: First, it permits discrimination against those who have or are suspected to have AIDS or another compromised immune system disease, but who do not evidence a food-borne illness. Second, it sanctions an employer forcing an employee to undergo testing because of a suspicion, based alone on rumor and innuendo.[1]

I

The majority of this Court holds that a severely compromised immune system associated with AIDS is unrelated to an individual's qualification for employment in the food-services industry. The compromised immune system must not be " 'accompanied by an opportunistic infection in a communicable form that

---

[1] My dissent is not intended to suggest that my colleagues on the Court lack in sensitivity to the various communities most closely affected by AIDS. I believe that they are acting with the best of intentions, but simply are wrong in their ruling today.

can be transmitted through contact with food.' " *Ante* at 712. I agree with that conclusion.

However, the majority also holds that an employer may require any person suspected of being afflicted with AIDS or another compromised immune system disease to be tested for communicable disease. There need be no evidence of illness or infection that could be transmitted through food handling. This part of the holding discriminates among employees having certain diseases not passed to others in food handling. It imposes a requirement not present in the Public Health Code. MCL 333.1101 *et seq.*; MSA 14.15(1101) *et seq.*

Additionally, the opinion permits discrimination by others by allowing an employer to oblige an employee to be tested when the employee evidences no illness or infection.

In authorizing testing in suspicion of AIDS, the majority also makes a medical decision that this Court is unqualified to make on the basis of the record before us. To the extent that this is a public health issue, it is best left to health care professionals who are experts in communicable diseases and AIDS. On the basis of the record, those professionals have spoken with one voice. They advise that no medically sound basis exists to test an employee with AIDS, unless there is evidence the employee has a food-borne illness. If the employee is sneezing or coughing or shows another sign of illness, the employer should excuse the person from work and may order testing before return.[2]

---

[2] Section 3-101 of the Food Service Sanitation Manual of the United States Public Health Service, as adopted by the Michigan Department of Public Health in 1981 AACS, R 325.25103(b) and the provisions of the 1981

The root question that should be dispositive here is whether the food-service worker is sick with a communicable disease that can be transmitted through food.

II

Food is not the vector for transmission of AIDS or the HIV virus, and that fact was well known in late 1987, when the controversy arose over Dorene Sanchez. According to a report of the United States Centers for Disease Control, individuals who had been identified as having AIDS could be grouped as follows:

> (1) sexually active homosexual and bisexual men (74 percent);
> (2) heterosexual intravenous drug abusers who share injection needles (17 percent);
> (3) heterosexuals who have intercourse with people who are seropositive or at high risk (4 percent);
> (4) hemophiliacs who have received contaminated blood-clotting factor products (1 percent);
> (5) other people who have received transfusions of contaminated blood (2 percent);
> (6) newborn infants or infected mothers (1 percent). [AIDS and the Law—A Guide to the Public, p 31 (Yale University Press, 1987).]

The virus had been isolated from blood, semen, vaginal secretions, saliva, tears, breast milk, cerebrospinal fluid, amniotic fluid, and urine. However, the Centers for Disease Control concluded that AIDS is transmitted

---

AACS, R 325.25909 authorize a food-service employer to exclude a food-service employee from working in a food-service establishment when the employee is suspected of having a disease that can be transmitted through food. See also 1981 AACS, R 325.25909(3).

only through sexual contact, exposure to infected blood, and perinatally from mother to child. Centers for Disease Control, Recommendations for Prevention of HIV Transmission in Health-Care Settings, 36 Morbidity & Mortality Weekly Report Supplement, No 2S (August 21, 1987).

Guidelines regarding AIDS were promulgated on November 15, 1985, with respect to food-service workers. Centers for Disease Control, Recommendations for Preventing Transmission of Infection With Human T-Lymphotropic Virus Type III/Lymphadenopathy-Associated Virus in the Workplace, 34 Morbidity & Mortality Weekly Report, pp 681-686, 691-695 (November 15, 1985). They reiterate that "[b]ecause AIDS is not transmitted through preparation or serving of food and beverages . . . food-service workers known to be infected with AIDS should not be restricted from work unless they have another infection or illness for which such restriction would be warranted." *Id.* The guidelines go on to provide:

> All FSWs [food-service workers] should follow recommended standards and practices of good personal hygiene and food sanitation. All FSWs should exercise care to avoid injury to hands when preparing food. Should such an injury occur, both aesthetic and sanitary considerations would dictate that food contaminated with blood be discarded. *FSWs known to be infected with HTLV-III/LAV need not be restricted from work unless they have evidence of other infection or illness for which any FSW should also be restricted.* Routine serologic testing of FSWs for antibody to HTLV-III/LAV is not recommended to prevent disease transmission from FSWs to consumers. [*Id.* (emphasis added).]

The United States Department of Agriculture also issued its own guidelines:

1. Since there is no data indicating a risk to employee safety or product wholesomeness based upon the presence of an individual who tests positive for the HIV virus, no changes or precautions need be initiated in the work place.

2. Since federal personnel regulations already address medical disabilities, an employee diagnosed as having AIDS will be treated no differently than any other employee with a medical disability.

3. The agency should develop an educational program for its employees. The program could be used to address the nature of the disease, its transmissibility, and types of medical counseling and support resources. [USDA, AIDS Information Memo (September 1987).]

This teaches that food was not considered an agent for transmitting AIDS as long ago as 1987. The USDA memo on AIDS is consistent with a publication of the Michigan Department of Public Health that was introduced into evidence in this case. Center for Health Promotion, Michigan Dep't of Public Health, AIDS: 100 Common Questions & Answers (January 1987). It instructs that someone diagnosed with AIDS employed in a restaurant working with food should be allowed to continue working as long as the employee is well enough to work. An exception exists where the work environment poses a risk of potential direct blood-to-blood contact with other individuals. Underlying the policy is the established fact that AIDS is not transmitted through casual contact, food, or water.

The Department of Public Health's position is also outlined in a letter in the materials submitted to this Court. In response to an inquiry regarding AIDS in the food-service workplace, the department relied on two reports: one from the Centers for Disease Control published in the November 15, 1985, issue of Morbidity and Mortality Weekly Report and one from the

National Restaurant Association. Both concluded that food-service workers known to be infected with AIDS need not be restricted from work " *'unless they have evidence of other infection for which any food-service worker would also be restricted.'* " *Ante* at 721, n 21. The majority believes that its holding is consistent with this position. However, the majority's holding clearly allows an employer to require an employee suspected of having AIDS to be tested in the *absence of evidence* of other infections.

That the Legislature clearly intended to encompass, in the Handicappers' Civil Rights Act's definition of handicap, persons with communicable diseases is supported by the Michigan Civil Rights Commission's policy statement. The statement explicitly concludes that AIDS is a covered "handicap." The Michigan Public Health Advisory Council has advised that "there is no need for specific precaution against AIDS in the work place." In part, on the basis of that advice, the commission has indicated that it will "accept and process complaints from persons who believe they have been discriminated against in employment . . . because of AIDS or a related condition or the perception of AIDS."

This is consistent with interpretations of similar statutes in other states. In *Raytheon Co v Fair Employment & Housing Comm*,[3] the court recognized the critical need to protect co-workers and others from contracting AIDS. It stressed that fear over AIDS and the widespread lack of knowledge about it had produced deep anxieties and considerable hysteria about the disease and those who suffered from it. However, the court held that ignorance and fear

[3] 212 Cal App 3d 1242; 261 Cal Rptr 197 (1989).

about AIDS could not justify a departure from rules requiring employers to prove a danger of transmission to co-workers before permitting discrimination.

In 1987, the United States Court of Appeals for the Ninth Circuit recognized "[t]he vast majority of opportunistic infections that prey upon AIDS patients are not transmissible to others with uncompromised immune systems." *Chalk v United States Dist Court Central Dist of California*, 840 F2d 701, 706, n 8 (CA 9, 1987).

It also is instructive to consider the United States Supreme Court case of *Nassau Co, Florida School Bd v Arline*,[4] which involved an elementary school teacher suffering from tuberculosis. The teacher was discharged following her third relapse. She sued her employer under the Rehabilitation Act, 29 USC 794, the statute after which the HCRA was patterned. The Supreme Court affirmed a finding by the United States Court of Appeals for the Eleventh Circuit that tuberculosis is, in fact, a "handicap." However, it remanded the case for a factual determination whether the plaintiff was "otherwise qualified" for her position, despite her disease. As to whether the risk of contagion alone would have constituted a covered handicap, the Court stated:

> Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others. By amending the definition of "handicapped individual" to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Con-

---

[4] 480 US 273; 107 S Ct 1123; 94 L Ed 2d 307 (1987).

gress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment. Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness. Even those who suffer or have recovered from such noninfectious diseases as epilepsy or cancer have faced discrimination based on the irrational fear that they might be contagious. The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments: the definition of "handicapped individual" is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief. The fact that *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious diseases. Such exclusion would mean that those accused of being contagious would never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they were "otherwise qualified." Rather, they would be vulnerable to discrimination on the basis of mythology—precisely the type of injury Congress sought to prevent. [*Id.* at 284-285 (emphasis in original).]

The type of discrimination referred to in this passage is what was visited on Dorene Sanchez. She was rumored to have AIDS. Her employer feared, among other things, that the rumor would adversely affect his business. Even though Sanchez was, by all appearances, healthy, her employer sent her to be tested for the AIDS virus. The record shows that the employer would not allow other employees to work when sick, but did not require them to provide evidence of their health status following an illness. Discrimination based on hysteria is, in part, what the HCRA is intended to eliminate.

This case is similar to *Saladin v Turner*.[5] There, the plaintiff was a waiter at an upscale restaurant in Oklahoma. His partner tested positive for HIV in the fall of 1987, and the restaurant's owner believed that the plaintiff also might be infected with HIV. The owner suspended the plaintiff from his employment until he was tested for HIV. After the test revealed no infection, he was allowed to return to work. The length of the plaintiff's absence was approximately two weeks. He returned to work, but in 1993, because his partner's health deteriorated, the restaurant owner forbade the plaintiff to discuss any AIDS-related issues with people at the restaurant. Soon after, he was summoned to a meeting with the owner and suspended for thirty days without pay.

The stated reasons for the suspension, which the plaintiff had tape recorded, were (1) alleged customer complaints about the plaintiff's discussions of his partner's health status, and (2) speculative concern that customers would be disturbed by the fact that the plaintiff was living with a person with AIDS. The court found a violation of the Americans with Disabilities Act. It concluded that the plaintiff's association with a person having a disability was a motivating factor in the defendant's decision to suspend the plaintiff from his employment.

In short, an employer is expected to send an employee home from work where there is evidence of a communicable disease that is transmitted through food or in the process of preparing and serving food or beverages. An employer also may require medical clearance to return to the workplace. However,

---

[5] 936 F Supp 1571, 1575 (ND Okla, 1996).

requiring an employee to be tested on the basis of a "suspicion" runs afoul of the HCRA's and ADA's proscription against medical examinations not job-related and not required by business necessity. 29 CFR 1630.14(c). Requiring *only* those suspected of having AIDS and other compromised immune system diseases to be tested for communicable diseases, absent some discernible evidence of a food-borne illness, is clearly a violation of the HCRA.

III

The majority also holds that "defendant's fear that plaintiff presented a health threat because she might introduce other diseases into the workplace was objectively reasonable . . . ." It considers the historical time in which these events occurred and the information the employer had in 1987. *Ante* at 725. However, whether an action is reasonable is not a matter of law. It is a classic jury question. Hence, the trial court and this Court err in resolving the question on a motion for summary disposition.

If, however, this determination were a matter of law, I would hold that the employer's suspicion in this case was not reasonable. Defendant's focus was not that plaintiff might have an opportunistic infection that lacked symptoms. The record shows that he was afraid, among other things, that he, his family, and his customers would get AIDS.[6] However, as discussed above, the information available in 1987 firmly estab-

---

[6] At the evidentiary hearing, defendant testified that although he was not a doctor, he was aware that pneumonia, salmonella, and cryptosporidia could be associated with AIDS. When pressed, however, defendant admitted that "that's what I'm thinking about, AIDS . . . that's what . . . was scaring [me] to death."

lishes that food was not a vector for the transmission
of AIDS.

Defendant's request that Sanchez be tested was not
based on a reasonable suspicion that Sanchez har-
bored some AIDS-associated communicable disease.
His request was based on rumor and innuendo,
Sanchez' expressed concern because of contact with
another who *might* have AIDS, and his own fears. This
is not sufficient to justify the type of discriminatory
behavior that defendant perpetrated here.

Accordingly, I would affirm the decision of the
Court of Appeals.